# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 36619

| | |
|---|---|
| KIRBY VICKERS, | ) |
| | ) Boise, December 2010 Term |
| Petitioner-Appellant, | ) |
| | ) 2011 Opinion No. 20 |
| v. | ) |
| | ) Filed: February 8, 2011 |
| PAMELA K. LOWE, P.E., in her capacity | ) |
| as director of the Idaho Transportation | ) Stephen W. Kenyon |
| Department, and THE IDAHO | ) |
| DEPARTMENT OF TRANSPORTATION, | ) |
| | ) |
| Respondents. | ) |
| | ) |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. D. Duff McKee, District Judge.

The district court's decision is affirmed. The award of attorney fees in the district court is vacated. No fees are allowed on appeal. Costs are awarded to Respondents.

Capital Law Group, Boise, for appellant. Tom Arkoosh argued.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, for respondents. Chris Kronberg argued.

_____

W. JONES, Justice

## I. NATURE OF THE CASE

Kirby Vickers challenges the Idaho Transportation Department's (ITD) decision to grant his neighbor, Dr. Edward Savala, a permit to expand an encroachment onto Highway 55. This permit is conditioned on Dr. Savala implementing certain additional safety features. Vickers claims that the ITD is not authorized to issue conditional-encroachment permits and that the new approach would impermissibly degrade highway safety. We affirm the conditional permit because it complies with the ITD's safety regulations.

## II. FACTUAL AND PROCEDURAL BACKGROUND

1

Dr. Edward Savala owns just over eight acres of land abutting the south side of an east-west stretch of Highway 55 in rural Canyon County. Although the highway runs straight for a considerable distance to the east of the parcel, it immediately begins a gradual curve to the south on the western edge of the property. In May of 2006, the Canyon County Board of Commissioners rezoned the land to permit Savala to build a commercial development containing a medical clinic, small restaurant, and a gas station. This Court upheld the conditional rezoning in *Taylor v. Canyon County Board of Commissioners*, 147 Idaho 424, 210 P.3d 532 (2009).

On December 21, 2005, Savala applied to the ITD for a right-of-way encroachment permit to upgrade his existing residential approach to a light commercial approach. Because a preexisting ditch-rider approach was too close to Savala's proposed encroachment, he had to seek a variance to the spacing rules.[1]

Shortly after Savala filed his original encroachment application, Kirby Vickers, who owns three parcels of land adjacent to Savala's property, was permitted to intervene and participate fully as an interested party before the ITD. Vickers opposed granting the permit, contending that a commercial approach would be unsafe for a number of reasons, including that drivers coming east around the curve would not have enough sight distance to safely avoid the traffic moving through the entrance to Savala's development.

After a series of denials, Savala's engineers submitted a proposal in September of 2007 (the "approved proposal") that included left and right turning lanes on Highway 55 for cars entering the encroachment. It also extended through the approach a passing lane for traffic coming around the curve and heading east on the highway, allowing vehicles turning right out of the development to gradually merge into traffic. On November 2, 2007, District 3 of the ITD (the "District") finally granted Savala a conditional permit for the encroachment. Before he could begin building the encroachment, however, the conditional permit required Savala to submit final plans to the ITD for approval as well as to obtain from a neighbor and transfer to the ITD an as-yet unknown amount of additional right-of-way to expand the highway. It also mandated that these final plans include the turning and passing lanes that appeared in the approved proposal.

---

[1] A ditch-rider approach allows irrigation personnel to access irrigation ditches, laterals, and canals.

Vickers petitioned the ITD to deny Savala's variance and conditional permit. After a two-day hearing, the hearing officer issued his Recommended Findings of Fact, Conclusions of Law, and Recommended Order ("Recommended Order"), concluding that Savala's encroachment would not degrade safety and traffic flow on Highway 55 and that the District was justified in granting the variance. The ITD Director then issued a Final Order adopting the Recommended Order. Vickers sought judicial review of this Final Order, but the district court affirmed the ITD and awarded fees and costs.

On appeal, Vickers contends that the ITD has no authority to issue conditional-encroachment permits. He also argues that the new approach will compromise highway safety because there will not be enough time to see the approach for motorists approaching from the west. The ITD responds that it properly followed its design standards and variance policy.

### III. ISSUES ON APPEAL

**1.** Whether the ITD could, within its statutory authority, grant a conditional permit to Savala without reviewing final construction plans.

**2.** Whether the ITD's decision to grant Savala a conditional permit and variance was based on substantial evidence.

**3.** Whether the district court properly awarded attorney fees and costs to the ITD below.

**4.** Whether the ITD is entitled to attorney fees on appeal.

### IV. STANDARD OF REVIEW

The Idaho Administrative Procedure Act (IAPA) governs contested cases before state agencies, which includes the ITD. I.C. § 67-5240; *Westway Constr., Inc. v. Idaho Transp. Dep't*, 139 Idaho 107, 111, 73 P.3d 721, 725 (2003). Under the IAPA, this Court reviews the agency's action independently of the district court. *Dupont v. State Bd. of Land Comm'rs*, 134 Idaho 618, 621, 7 P.3d 1095, 1098 (2000). This Court freely reviews questions of law, *Rahas v. Ver Mett*, 141 Idaho 412, 414, 111 P.3d 97, 99 (2005), but cannot reweigh the evidence on questions of fact, *Lane Ranch Partnership v. City of Sun Valley*, 145 Idaho 87, 89, 175 P.3d 776, 778 (2007) (citing I.C. § 67-5279). The IAPA provides the standard of review as follows:

> [T]he court shall affirm the agency action unless the court finds that the agency's findings, inferences, conclusions, or decisions are:
>
> (a) in violation of constitutional or statutory provisions;

3

(b) in excess of the statutory authority of the agency;
(c) made upon unlawful procedure;
(d) not supported by substantial evidence on the record as a whole; or
(e) arbitrary, capricious, or an abuse of discretion.

I.C. § 67-5279(3). Even if one of these conditions is met, this Court will still affirm the agency action "unless substantial rights of the appellant have been prejudiced." *Id.* § 67-5279(4).

## V. ANALYSIS

### A. The ITD Is Empowered to Issue Conditional Permits for Right-of-Way Encroachments

Vickers contends that the ITD lacks express authority to issue a conditional permit because, to do so, it makes a final decision before it has reviewed the final construction plans and made conclusive findings about the new encroachment's safety. Further, no statute specifically provides authority to issue conditional permits.

Since the Legislature cannot possibly foresee all the practical difficulties that state agencies will encounter while carrying out their statutory functions, "administrative agencies have the implied or incidental powers that are reasonably necessary in order to carry out the powers expressly granted." 2 Am. Jur. 2d *Administrative Law* § 57 (2004). The Legislature "has empowered ITD and its Board to make rules and regulations controlling rights of access to and the safe use of state highways." *Lochsa Falls, L.L.C. v. State*, 147 Idaho 232, 238, 207 P.3d 963, 969 (2009). The Idaho Code confers to the ITD the power to "[e]stablish standards for the location, design, construction, reconstruction, alteration, extension, repair and maintenance of state highways." I.C. § 40-310(5); *accord id.* § 40-312(1).

The power to determine when and how a developer may build an encroachment is implied from the ITD's authority to regulate the design of public highways. A conditional permit allows the ITD to reserve the right to review construction plans to guarantee that applicants comply with the approved encroachment designs. The ITD's regional departments therefore use conditional permits to enforce highway-safety standards while assuring the applicant that he or she can develop detailed construction plans, obtain the necessary rights-of-way from other landowners, and undertake other final expenses. Vickers does not articulate any practical reasons to disallow such a practice, nor does he explain why such a power could not naturally be implied from the ITD's statutory authority. The ITD therefore possesses the implied power to conditionally approve encroachment applications.

4

**B.     The ITD Correctly Granted a Conditional Permit and Variance to Savala**

Vickers conflates his challenge to Savala's variance with a challenge to the permit itself. In opposing both, Vickers contends: (1) the encroachment as a whole will hamper highway safety and functionality because there is insufficient sight distance for drivers approaching from around the curve; and (2) Savala could instead have reached Highway 55 by building an access to Pride Lane, a road east of the property that intersects with Highway 55. A more orderly way to address Vickers's arguments is to review the two separate decisions the ITD made below: granting Savala's encroachment permit and granting a variance to the spacing requirements.

*1.     The Plan Calls for a Sufficient Stopping Sight Distance to Merit an Encroachment Permit*

Vickers primarily objects to Savala's permit on the grounds that the ITD did not require Savala to provide the minimum sight distance necessary under a set of industry standards known as the "Green Book."

Idaho Transportation Department, *Access Management: Standards and Procedures for Highway Right-of-Way Encroachments* (2002) [hereinafter "Access Manual"] requires that the new approach be designed so that the "operational efficiency and safety of the State highway are not compromised." Access Manual § 3.13. Among the many things the Access Manual requires is that there be an adequate distance for motorists to see the roadway ahead and stop to avoid potential collisions at a highway approach. *Id.* § 4.5.6. The posted speed limit for the relevant stretch of Highway 55 is 55 miles per hour. The Access Manual specifically mandates 450 to 550 feet of sight distance to an approach when the posted speed limit is 55 miles per hour. *Id.* § 4.5.6 tbl.4.5.6.1.

The Access Manual, however, also states that when determining sight-distance requirements, engineers should consult American Association of State Highway and Transportation Officials, *A Policy on Geometric Design of Highways and Streets* (5th ed. 2004) [hereinafter "AASHTO Green Book"], which is commonly known as the "Green Book." Access Manual § 4.5.6. Even though it is mentioned in the Access Manual, the AASHTO Green Book is not a legal standard. The ITD, not AASHTO, prescribes the standards applicable to highway approaches in Idaho. IDAPA 39.03.42.300.06, 400.01. The Access Manual states that it "provides standards and procedures necessary to regulate and control access to and encroachments within State highway rights-of-way." Access

5

Manual § 1.1.[2]  It frequently mentions the Green Book but does not anywhere adopt its specifications as binding rules.

Unlike the Access Manual, which sets stopping-sight distances according to the posted speed limit, the Green Book provides that stopping-sight distances should ideally be computed based on the roadway's design speed.  AASHTO Green Book, *supra*, at 112. Design speed is based primarily on how fast traffic actually travels on the roadway.  *Id.* at 67–72.  The Green Book recommends setting the speed at the 85th percentile of observed driver speeds rounded to the nearest 5 miles per hour, which here was 65 miles per hour, *id.* at 72, according to a study conducted by the ITD.  At this speed, the Green Book requires 645 feet of stopping sight distance on the stretch of highway along Savala's approach.  *Id.* at 112.

Even if the AASHTO Green Book controlled in this case, the existing sight distance is sufficient for drivers approaching Savala's proposed approach from around the curve to the west.  Savala's engineers conducted a topographical survey and measured the sight distance at 700 feet.  Another engineering firm found the distance to be 690 feet, a number also confirmed by the ITD District's own traffic review.  Further, a condition of Savala's permit requires him to grade the ground next to the road, which could increase the sight distance even further.  Since the sight distance exceeds specifications in both the ITD's Access Manual and the AASHTO Green Book, there was ample evidence to support granting the conditional permit.

According to Vickers, Savala's and the ITD's engineers are wrong because the actual sight distance is between 645 and 648 feet.  He complains that Savala and the ITD incorrectly rely on measurements taken before Savala changed the designs in his final proposal, moving south by 6.5 feet the stop line for vehicles exiting the approach and entering the highway from the south.  Although Vickers correctly observes that cars traveling around the curve might not be able to see cars at the new stop line as early as in previous designs, he obtained his measurement simply by using a ruler on a scale drawing of the highway.  He does not explain how much effect moving the stop line had on the overall sight distance.  The measurements taken by Savala and the ITD, obtained through more

---

[2] All of the engineers who testified at the hearing except Vickers agreed that, since engineers usually rely on their professional judgment when designing roadways, the Green Book simply provides guidance rather than hard design rules.

reliable topographical surveys and field measurements, provided the ITD with substantial evidence on which to conclude that sufficient sight distance is available. Moreover, even if the ITD accepted Vickers's figures, they would still meet the Access Manual's 450- to 550-foot requirement. Access Manual § 3.13 tbl.4.5.6.1.

The stretch of Highway 55 immediately west of the Savala approach has a downward grade of about two percent. Vickers argues that since the AASHTO standards are designed only for perfectly level roads, there needs to be more stopping-sight distance. Even if the Green Book were binding, and even if the downgrade were three percent, the Green Book would still only mandate a 682-foot stopping-sight distance. AASHTO Green Book, *supra*, at 115. Because the ITD and Savala both measured the stopping sight distance to be between 690 and 700 feet, the ITD had substantial evidence to determine that the sight distance for Savala's approach was sufficient.

Vickers last contends that since vehicles will be making slow and exposed left-hand turns out of Savala's upgraded approach, the ITD should require Savala to meet a different number the AASHTO Green Book calls an "intersection-sight distance," which would be 720 feet if applied to his encroachment. *Id.* at 661. The intersection-sight distance is similar to the stopping sight distance, but calls for more road length to allow additional time for stopped drivers to decide whether it is safe to turn into an intersection. *Id.* at 650–51.

First, the ITD, as a matter of law, does not have to impose the Green Book's intersection-sight distance on Savala's encroachment. Again, the Green Book is not a binding legal standard. Even if the Green Book carried any force, it defines an intersection "as the general area where two or more highways join or cross," a definition that does not apply to Savala's private commercial approach. *Id.* at 555.

Second, the ITD correctly determined, as a factual matter, that the new approach as designed would be safe enough with its preexisting stopping-sight distance and that applying an intersection-sight distance is unnecessary. The Green Book states that stopping-sight distance alone is generally sufficient and that longer intersection-sight distances are merely "desirable." *Id.* at 651. Both Savala's engineer and one of the ITD's engineers testified that the intersection sight distance is merely intended to prevent drivers on a busier highway from ever having to slow down for vehicles entering the highway, but that it is sufficient that the stopping-sight distance provides traffic with enough time to come to a complete stop to

avoid a collision. Savala's design combines two preexisting adjacent approaches into a single upgraded encroachment that will include a new left-turn bay, a right-hand deceleration lane, and a merging lane to allow eastbound traffic to drive straight past the approach—all of which are features that will mitigate concerns about drivers on Highway 55 having to slow down or swerve to avoid traffic entering the highway from Savala's approach. Also, regardless of whether the approach sight distance meets the intersection sight distance requirement, the final plans might reveal that Savala will grade the area to meet the intersection sight distance anyway. Savala has the obligation to comply with the conditional permit and the ITD retains the authority to review construction plans to ensure that they do comply with the approved encroachment design and the other conditions set forth in the permit. In summary, there was substantial evidence that the new approach will not compromise highway safety.

> 2. *There Is Substantial Evidence That the Variance Will Not Degrade Highway Safety or Functionality*

Under the ITD's rules, Highway 55 is a Type III highway, which may only contain one approach every 1000 feet.[3] IDAPA 39.03.42.011.03, 39.03.42.400.03.c. Any time a proposal does not meet the ITD's access management policies, the applicant must obtain a variance. Access Manual § 3.16. The ITD required Savala to apply for a variance because the proposed encroachment would be near a preexisting ditch-rider approach on the west side of Savala's property near the end of the curve.

In weighing whether a variance should be granted, the Access Manual imposes a higher standard on applicants seeking a variance versus an ordinary permit by requiring that the variance must not negatively impact highway safety or functionality. It provides:

> A request for a variance **may** receive favorable consideration under the following conditions:
>
> . . . .
> - If the variance offers an opportunity to accommodate a joint-use access serving two or more properties abutting the State highway.
> - If the variance would improve traffic safety or operations.

---

[3] The ITD rules identify five types of different public highways, but characterize both Type III and Type IV state highways as "principal arterials." They primarily differ in that Type IV highways "have four (4) or more lanes with a median or continuous center turn lane," while Type III highways do not. IDAPA 39.03.42.011. Although the parties have occasionally referred to Highway 55 as a Type IV highway, it is actually Type III because it has two traffic lanes as it passes by the Savala approach and has no continuous turning lane or median.

8

. . . .

A request for a variance may **not** receive favorable consideration under the following conditions:

. . . .

- If the variance would negatively impact safety.
- If the variance would degrade traffic operations of the system.

Access Manual § 3.16 (emphases in original).

Vickers argues that upgrading the encroachment would automatically degrade highway operations by adding traffic and increasing the number of decisions drivers must make while in or near the approach. Vickers misunderstands the ITD's variance policy. Of course, almost any improvement to a highway approach that attracts more traffic will in some way worsen highway conditions. The ITD would almost never be able to permit anyone to modify a state-highway approach if every design had to have absolutely no impact on highway operations. The only question here is whether Savala's *variance*, which merely allows two adjacent approaches to coexist within 1000 feet, will worsen highway safety or functionality. *See* § 3.16 (stating that a variance request may not be approved if the *variance* would degrade traffic operations or safety).

There was substantial evidence on which the ITD could conclude that building the encroachment near the ditch-rider approach would not violate the variance policy. "[T]he agency's factual determinations are binding on the reviewing court, even when there is conflicting evidence before the agency, so long as the determinations are supported by evidence in the record." *Neighbors for a Healthy Gold Fork v. Valley Cnty.*, 145 Idaho 121, 126, 176 P.3d 126, 131 (2007). The ditch-rider approach here cuts across the western corner of Savala's land to access an irrigation canal and a vacant lot. The ITD's Highway Operations and Safety Engineer testified that, in the Department's experience, ditch-rider approaches are quite common in southwest Idaho and generate exceptionally low volumes of traffic. The new encroachment would also combine two existing access points into one, improving safety on the highway and providing a favorable basis on which to grant the variance. *See* Access Manual § 3.16 (providing that variances can be granted where two approaches are being merged). The ITD was therefore justified in concluding that the variance would not degrade highway safety or operations.

C.     **Neither Party Is Entitled to Attorney Fees Either in the District Court or on Appeal**

9

Pursuant to I.C. § 12-117, the district court found that Vickers was simply questioning the ITD's factual findings and awarded fees to the ITD, a ruling that Vickers challenges on appeal. The ITD responds that it should receive fees both in the district court and on appeal under § 12-117.

Neither party can receive fees either in the district court or on appeal to this Court. The Legislature recently amended I.C. § 12-117, and as this Court held in *Smith v. Washington County*, courts are no longer permitted to award fees in administrative judicial proceedings. No. 35851, 2010 WL 5093625, at *3–4 (Idaho Dec. 15, 2010). Thus, I.C. § 12-117 does not provide a statutory basis for any attorney fees in this case.

## VI. CONCLUSION

The ITD's decision to grant Dr. Savala's encroachment permit and variance was based on substantial evidence and is affirmed. Neither party is entitled to attorney fees under I.C. § 12-117 either in the district court or on appeal because this is an appeal of an administrative decision. The district court's award of attorney fees is reversed. Costs are awarded to Respondents.

Chief Justice EISMANN, Justices BURDICK, J. JONES and HORTON **CONCUR.**